# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

Case No. 25-1224

| | |
|---|---|
| ESTATE OF RICHARD WARD, *et al*.,<br><br>Plaintiffs-Appellees,<br><br>vs.<br><br>CHARLES MCWHORTER, *et al*.,<br><br>Defendants-Appellants. | (D.C. No. 1:23-CV-00473-CNS-MDB)<br>(D. Colo.)<br><br>On appeal from the United States District Court of Colorado, Honorable Judge Charlotte N. Sweeney |

## APPELLANTS' OPENING BRIEF

## ORAL ARGUMENT REQUESTED

**Sean J. Lane, Esq.**
**Alex M. Pass, Esq.**
THE LANE LAW FIRM, P.C.
3131 S. Vaughn Way, Ste. 220
Aurora, CO 80014
Telephone:  (720) 464-4215
*Counsel for Appellants*

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………4

STATEMENT OF PRIOR OR RELATED APPEALS……………...…....……….6

I.      JURISDICTIONAL STATEMENT…………………………………………6

II.     ISSUES PRESENTED FOR REVIEW……………………………………...8

A.      *Whether the District Court utilized the incorrect method of distinct factual analysis relative to the question of Defendants' entitlement to qualified immunity;*

B.      *Whether the law prohibiting Defendants' alleged conduct was clearly established at the time of the alleged violation of Richard Ward's constitutional rights;*

C.      *Whether the facts that the district court ruled a reasonable jury could find, even when viewed in a light most favorable to Plaintiff, would suffice to show a violation of Kristy Ward Stamp's constitutional rights;*

D.      *Whether the version of events the district court held a reasonable jury could credit are blatantly contradicted by the record and, if they are, whether the true facts entitle Defendants to qualified immunity.*

III.    STATEMENT OF THE CASE…………………...……………………………9

        A.      *Factual Background*…………………………………..………………9

        B.      *Procedural Background*……………………………………………..11

IV.     STATEMENT OF THE FACTS…………………………………………...12

V.      SUMMARY OF THE ARGUMENT………………………………………26

VI.    STANDARD OF REVIEW…………………………………………..…….…30

VII.    ARGUMENT……………………………………………………………31

    *1.    The District Court utilized the incorrect method of distinct factual analysis relative to the question of Defendants' entitlement to qualified immunity*………………………………………………………………………………….31

    *2.    The law prohibiting Defendants' alleged conduct was not clearly established at the time of the alleged violation(s) of Ward's constitutional rights*……………………………………………………………………........33

    *3.    The facts that the district court ruled a reasonable jury could find, even when viewed in a light most favorable to Plaintiff, do not suffice to show a violation of Kristy Ward Stamp's constitutional rights*..……………………………………..41

    *4.    The version of events the district court held a reasonable jury could credit are blatantly contradicted by the record*..…………………………………43

VIII.   CONCLUSION……………………………………………………..……..54

IX.    STATEMENT REGARDING ORAL ARGUMENT……………………...54

X.    CERTIFICATE OF COMPLIANCE WITH Fed.R.App.P. 32(a)………….55

CERTIFICATE OF DIGITAL SUBMISSION/SERVICE………………..…….56

ATTATCHMENT 1: District Court Order Filed 05/09/2025

# TABLE OF AUTHORITIES

**Cases**                                                                    ***Pages***

*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997)……………………………………...39

*Ashcroft v. al-kidd*, 563 U.S. 731, 741 (2011)………………………………….…….37

*Bailey v. U.S.*, 568 U.S. 186 (2013)……………………………………………………..41

*Cantu v. City of Dothan*, 974 F.3d 1217 (11th Cir. 2020)……………………………40

*Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007)…………………39

*Clerkley v. Holcomb*, 121 F.4th 1359 (10th Cir. 2024)………………...…28, 36, 37, 38

*Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009)………………………………...38

*Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015)………………………………...27, 31

*Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016)……………………………..27, 28

*Est. of Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016)…………..40

*Est. of Booker v. Gomez,* 745 F.3d 405 (10th Cir. 2014)…………………………...28

*Est. of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019)…………………………38

*Est. of Harmon v. Salt Lake City*, No. 23-4125, --- F.4th ----, 2025 WL 1163268 (10th Cir. Apr. 22, 2025)……………………………………………………..28, 36, 37

*Est. of Harmon v. Salt Lake City*, 2021 U.S.App.Lexis 39942 (10th Cir. Nov. 10, 2021)………………………………………………………………………28, 38

*Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008)………...30

*Green v. Post*, 574 F.3d 1294 (10th Cir. 2009)………………………………….36, 37

*Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018)………………………….37

*Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007)………………………………...39

*Henderson v. Glanz*, 813 F.3d 938 (10th Cir. 2015)…………………7, 31, 43, 44, 53

*Maresca v. Bernalillo County,* 804 F.3d 1301 (10th Cir. 2015)……………………..41

*Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001)…………………….……27, 30, 33

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)………………….......................................7

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015)…………………………….....28, 34, 35

*Nelson v. McMullen*, 207 F.3d 1202 (10th Cir. 2000)…………………………..27

*Perry v. Durborow*, 892 F.3d 1116 (10th Cir. 2018)………………….…...37, 38

*Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020)………………………..33

*Scott v. Harris*, 550 U.S. 372 (2007)……………………………………………31

*Scull v. New Mexico*, 236 F.3d 588 (10th Cir. 2000)……………………………27

*Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995)…………………………..39

*Smith v. Ray*, 781 F.3d 95 (4th Cir. 2015)……………………………………39

*Surat v. Klamser*, 52 F.4th 1261, 1276 (10th Cir. 2022)……………28, 29, 34, 35, 36

*Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009)…..........27, 31, 32

*United States v. Charley*, 396 F.3d 1074 (9th Cir. 2005)……………..…29, 42, 43

*United States v. Hensley,* 469 U.S. 221 (1985)…………………………………..42

*United States v. Merkley*, 988 F.2d 1062 (10th Cir. 1993)…………………………41

*United States v. White*, 584 F.3d 935 (10th Cir. 2009)……………………29, 42, 43

*United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008)…...27, 31

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021)………………43

*William v. Hansen*, 5 F.4th 1129 (10th Cir. 2021)………………………………...36

*York v. City of Las Cruces*, 23 F.3d 1205 (10th Cir. 2008)………………………30, 31

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006)…………………………38

**Statutes**

Colo.Rev.Stat. § 13-21-201………………………………………………….…11

28 U.S.C. § 1291………………………………………………………................…7

42 U.S.C. § 1983………………………………………………………...38, 39

**Rules**

Fed.R.App.P. 32(a)(5)………………………………………………………..55

Fed.R.App.P. 32(a)(6)………………………………………………….....55

Fed.R.App.P. 32(a)(7)(B)………………………………………………55

Fed.R.App.P. 32(f) …………………………………………………………..55

## STATEMENT OF PRIOR OR RELATED APPEALS:

There are no prior or related appeals.

## I.    JURISDICTIONAL STATEMENT

"The court of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States … except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1291. "Although 28 U.S.C. § 1291 vests the courts of appeals with jurisdiction over appeals only from 'final decisions' of the district courts, 'a decision 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case.'" *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985). "Thus, a decision of a district court is appealable if it falls within 'that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Id*. at 524-25.  "A major characteristic of the denial or granting of a claim appealable under [the] 'collateral order' doctrine is that 'unless it can be reviewed before [the proceedings terminate], it can never be reviewed at all.'" *Id*. at 525.

"To establish jurisdiction under the collateral order doctrine, defendants must establish that the district court's order (1) conclusively determined the disputed question, (2) resolved an important issue completely separate from the merits of the case, and (3) is effectively unreviewable on appeal from a final judgment." *Henderson*

*v. Glanz*, 813 F.3d 938, 947 (10th Cir. 2015). "'The denial of qualified immunity to a public official … is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law.'" *Id*. "On interlocutory appeal, [the Tenth Circuit Court of Appeals] may review: ''(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.''" *Id*. at 948.

> Even when an appellant challenges the district court's findings of genuine issues of material fact, the Supreme Court has recognized two circumstances in which [the Tenth Circuit Court of Appeals] may nonetheless exercise interlocutory review. First, if a district court fails to specify which factual disputes precluded a grant of summary judgment for qualified immunity, … [the Tenth Circuit Court of Appeals] may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed. *Second, when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' [the Tenth Circuit Court of Appeals] may assess the case based on [the Court's] own de novo view of which facts a reasonable jury could accept as true.*

*Id.*

## II.    ISSUES PRESENTED FOR REVIEW

The issues to be raised in this appeal include:

A.    *Whether the District Court utilized the incorrect method of distinct factual analysis relative to the question of Defendants' entitlement to qualified*

8

*immunity;*

B.    *Whether the law prohibiting Defendants' alleged conduct was clearly established at the time of the alleged violation of Richard Ward's constitutional rights;*

C.    *Whether the facts that the district court ruled a reasonable jury could find, even when viewed in a light most favorable to Plaintiff, would suffice to show a violation of Kristy Ward Stamp's constitutional rights;*

D.    *Whether the version of events the district court held a reasonable jury could credit are blatantly contradicted by the record and, if they are, whether the true facts entitle Defendants to qualified immunity.*

## III.    STATEMENT OF THE CASE

### A.    *Factual Background*

On February 22, 2022, Pueblo County Sheriff's Office ("PCSO") dispatch received a "911" call seeking law enforcement assistance at Liberty Point International School (the "School") concerning a suspicious male attempting to break into vehicles in the middle school parking lot. The yet to be identified male acted aggressively with the occupants of at least one vehicle and appeared to be under the influence of drugs and/or alcohol. PCSO Deputies Charles McWhorter ("Deputy McWhorter") and Cassandra Gonzales ("Deputy Gonzales") responded to the call.

Upon contacting the suspect, Richard Ward ("Ward"), then seated in the rear seat of a white 2008 Lexus RX 350 (the "Vehicle") occupied by two other individuals, one of whom was wearing a hood and dark sunglasses, Deputy McWhorter began to investigate the individuals' (including Ward's) suspected criminal activity. Deputy McWhorter asked Ward if he had any identification or weapons, to which Ward responded that he may have a knife, as he began to rummage through his pockets. Ward turned away from the Deputies to conceal his actions as he placed his hand into the inner chest area of his jacket; at the same time, Ward, facing away from the deputies placed an unknown item or substance in his mouth, and swallowed. In response to Ward's concealed actions, Deputy McWhorter attempted to remove Ward's hand from his jacket and Ward, himself, from the confinement of the Vehicle. Ward resisted his removal from the Vehicle and his detention, and began to violently wrestle with the deputies. Deputy Gonzales attempted to utilize pain compliance techniques but was unable to gain Ward's compliance as he continued to fight with the deputies. Ward headbutted Deputy McWhorter causing serious bodily injury and, during the struggle, grabbed onto Deputy McWhorter's duty belt, holster, and firearm. Fearing for his life, the life of Deputy Gonzales, and the lives of those around him, Deputy McWhorter then drew his firearm and fired three shots, killing Ward.

After the officer involved shooting ("OIS") occurred, Deputies McWhorter and

Gonzales ordered the two yet to be identified individuals to remain in the Vehicle. By happenstance, Pueblo Police Department ("PPD") officers were present at the School to pick up their children at the time of the OIS; PPD was independently notified of the OIS and radioed dispatch that the CRIT/Command page was sent, activating the Tenth Judicial District Critical Incident Team ("CIT"). PPD, not PCSO, was designated the lead investigative agency. The CIT directed PCSO personnel to detain and transport Kristy Ward Stamp to the PCSO Annex pending further investigation, away from the now active crime scene, below freezing temperatures, and falling snow.

### B.    Procedural Background

On February 21, 2023, Plaintiffs, Estate of Richard Ward, by and through its personal representative Kristy Ward Stamp, and Kristy Ward Stamp ("Plaintiff"), initiated the instant matter asserting and alleging violations of the Plaintiffs' various state and federal constitutional rights and for battery causing wrongful death pursuant to COLO.REV.STAT. § 13-21-201, *et seq*. On or about April 24, 2023, Defendants moved to dismiss Plaintiffs' Complaint and Jury Demand pursuant to Federal Rules of Civil Procedure 12 and 8. On July 25, 2023, the district court granted in part and denied in part Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12 and Fed.R.Civ.P. 8.

On August 8, 2023, Plaintiffs submitted their Amended Complaint and Jury

Demand asserting and alleging substantially similar claims against the previously named individual Defendants and against Pueblo County Sheriff David J. Lucero and the Pueblo County Board of County Commissioners. On September 5, 2023, Defendants, again, moved to dismiss Plaintiffs' operative Complaint and Jury Demand. On January 11, 2024, the District Court granted in part and denied in part Defendants' Motion to Dismiss Amended Complaint Pursuant to Fed.R.Civ.P. 12 and Fed.R.Civ.P. 8, disposing of Plaintiffs' Eighth and Ninth Claims for Relief, which had, prior to dismissal, alleged violations of Plaintiff 's First Amendment rights to the United States Constitution and Article II, Section 10 of the Colorado Constitution.

On April 1, 2024, Plaintiffs filed their Second Amended Complaint and Jury Demand (the "Operative Complaint"). On or about April 22, 2024, Defendants submitted their Second Amended Answer and Jury Demand. After conducting discovery in this matter, Plaintiffs moved for partial summary judgment, seeking summary judgment on Plaintiffs' Fourth and Fifth claims for relief. Shortly thereafter, Defendants moved for summary judgment on each of Plaintiffs' claims. Defendants' Motion for Summary Judgment was predicated, in part, upon issues of qualified immunity. On May 9, 2025, the district court issued its Order granting in part and denying in part the Parties' motions for summary judgment. This appeal follows.

## IV.    STATEMENT OF THE FACTS

1.      On February 22, 2022, at approximately 3:21:08 p.m., witness Eric Valencia ("Valencia") called "911" to report a suspicious person outside the School, indicating the suspicious person was acting erratically, aggressively attempting to get into various parked cars and appeared to be under the influence of drugs and/or alcohol. *See* 911 - Reporting Party Call, at 00:00-00:30 ("Exhibit A" to Defendants' Motion for Summary Judgment) (Conventionally Submitted).

2.      The suspicious person was described by Valencia as "psycho." *See* Exhibit A to Defendants' Motion for Summary Judgment, at 00:32-00:37.

3.      Deputy McWhorter arrived on scene at 3:28:03 p.m. and Deputy Gonzales arrived on scene very shortly thereafter. *See* McWhorter BWC ("Exhibit B" to Defendants' Motion for Summary Judgment), at 00:00; Gonzales BWC ("Exhibit C" to Defendants' Motion for Summary Judgment) 00:00 (Conventionally Submitted).

4.      Deputy McWhorter notified dispatch that the suspicious person was located in the back of the Vehicle at 3:29:14 p.m. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 00:20-00:29.

5.      Plaintiff was located in the front passenger seat of the Vehicle wearing a hood and dark sunglasses. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 00:33-00:47.

6.     As Deputy McWhorter approached the Vehicle, Ward flung open the rear passenger door without prompting. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 00:28-00:33.

7.     When Deputy McWhorter asked Ward who his little brother was, Ward could not remember his brother's name. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 00:30-00:48.

8.     Ward swung his leg out of the Vehicle, indicating to Deputy McWhorter, based on his training and experience, that he was a flight risk and may be about to run. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 00:45-00:50; Charles McWhorter Deposition ("Exhibit D" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 906 (p. 182, ll. 9-13).

9.     Deputy McWhorter asked Ward if he had any identification or any weapons, to which Ward replied that he may have a knife. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:10-2:20.

10.     Ward placed something in his mouth and swallowed it and Deputy McWhorter asked Ward what he placed in his mouth. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:15-2:25; Exhibit C to Defendants' Motion for Summary Judgment, at 00:35-00:40.

11.     At the same time, Ward placed his hand into his jacket in a manner indicative of an individual reaching for a concealed weapon. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 00:35-00:40; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 907 (p. 212, ll. 3-25), App'x Vol. 4, at p. 908 (p. 213, ll. 1-17), App'x Vol. 4, at p. 909 (p. 221, ll. 23-25), App'x Vol. 4, at p. 910 (p. 222, ll. 1-17); BWC screenshots 1 ("Exhibit E" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at pp. 921-922; Roger Clark Deposition ("Exhibit F" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 926 (p. 38, ll. 14-25), App'x Vol. 4, at p. 927 (p. 39, ll. 1-10), App'x Vol. 4, at p. 928 (p. 41, ll. 2-14).

12.     McWhorter attempted to remove Ward's hand from his jacket and Ward from the Vehicle.  *See* Exhibit C to Defendants' Motion for Summary Judgment, at 00:35-00:43; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 907 (p. 212, ll. 3-25), App'x Vol. 4, at p. 908 (p. 213, ll. 1-17), App'x Vol. 4, at p. 909 (p. 221, ll. 23-25), App'x Vol. 4, at p. 910 (p. 222, ll. 1-25), App'x Vol. 4, at p. 911 (p. 223, ll. 1-8).

13.     Ward resisted his removal from the Vehicle and his detention. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:20-2:40; Exhibit C to Defendants' Motion for Summary Judgment, at 00:35-00:55; Exhibit D to Defendants'

Motion for Summary Judgment, at App'x Vol. 4, at p. 918 (p. 312, ll. 9-18); Cassandra Gonzales Deposition ("Exhibit G" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 933 (p. 125, l. 2); Stacy Hoff Interview ("Exhibit H" to Defendants' Motion for Summary Judgment), at 4:40-4:50, 5:45-6:00 (Conventionally Submitted).

14.    Ward tackled Deputy McWhorter. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:25-2:35; Exhibit C to Defendants' Motion for Summary Judgment, at 00:45-00:55; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 916 (p. 261, ll. 8-13); BWC screenshots 2 ("Exhibit I" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 939-941.

15.    Ward yelled, "yeah boy" and "come on boy" while he fought with Deputy McWhorter.  *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:25-2:35; Exhibit C to Defendants' Motion for Summary Judgment, at 00:45-00:55; Exhibit H to Defendants' Motion for Summary Judgment, at 1:28-1:38, 5:30-5:45; Axon_X60333730_EnchancedAudio Recording of BWC ("Exhibit J" to Defendants' Motion for Summary Judgment), at 2:30-2:40 (Conventionally Submitted).

16.    The deputies, and even Plaintiff Kristy Ward Stamp, gave commands for Ward to put his hands behind his back and to "stop resisting", but Ward ignored their commands to "stop resisting." *See* Exhibit B to Defendants' Motion for Summary

Judgment, at 2:28-2:44; Exhibit C to Defendants' Motion for Summary Judgment, at 00:45-1:02; Kristy Ward Stamp Deposition ("Exhibit K" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 948 (p. 142, ll. 11-23).

17.    Deputy Gonzales attempted to utilize pain compliance techniques on Ward to gain his compliance. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 00:50-1:02; BWC screenshots 3 ("Exhibit L" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 952.

18.    Ward continued to fight Deputy McWhorter, despite Deputy Gonzales' use of pain compliance techniques. *Id*.

19.    Ward headbutted Deputy McWhorter, causing Deputy McWhorter to suffer serious bodily injury. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 3:3:10, 3:20-3:28; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 919 (p. 314, ll. 1-12); Photographs of Deputy McWhorter ("Exhibit M" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at pp. 953-961; Parkview Medical Records ("Exhibit N" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at pp. 962-969; Physician's Report of Worker's Compensation Injury ("Exhibit O" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 970.

20.     During the fight, Ward grabbed onto Deputy McWhorter's duty belt, holster, and firearm. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 3:00-3:10; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 912 (p. 229, ll. 23-25), App'x Vol. 4, at p. 913 (p. 230, l. 1.), App'x Vol. 4, at p. 916 (p. 261, ll. 8-13); Exhibit G to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 934 (p. 185, ll. 4-18), App'x Vol. 4, at p. 935 (p. 186, ll. 8-19), App'x Vol. 4, at p. 936 (p. 187, ll. 18-25), App'x Vol. 4, at p. 937 (p. 188, ll. 1-8); Exhibit H to Defendants' Motion for Summary Judgment, at 6:27-7:30.

21.     Deputy McWhorter reasonably believed Ward was trying to draw his firearm from its holster. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 3:00-3:10; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 912 (p. 229, ll. 23-25), App'x Vol. 4, at p. 913 (p. 230, l. 1), App'x Vol. 4, at p. 916 (p. 261, ll. 8-13).

22.     In order to defend himself, Deputy McWhorter removed his firearm from its holster and shot Ward three times. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:40-2:50; Exhibit C to Defendants' Motion for Summary Judgment, at 1:00-1:10.

23.     The end of school day bell rang at 3:30 p.m., approximately one-minute before Deputy Gonzales advised dispatch, "shots fired." *See* Exhibit C to Defendants'

Motion for Summary Judgment, at 1:00-1:10; Bell Schedule ("Exhibit P" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at pp. 971-973.

24.    By happenstance, PPD officers were present at the School to pick up their own children at the time of the OIS and PPD was independently notified of the OIS at 3:35:19 p.m. *See* Pueblo Police Department Event Report, at p. 1 ("Exhibit Q" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 974.

25.    At 3:38:14 p.m., PPD radioed dispatch that the CRIT/Command page was sent and a request to secure the scene was made. *See* Exhibit Q to Defendants' Motion for Summary Judgment, at p. 1, at App'x Vol. 4, at p. 974.

26.    Immediately following the OIS, the CIT was activated to investigate the incident and take charge of the scene. The CIT consisted of members of the PPD, Colorado State Patrol, CBI, and the DA's Office. *See* District Attorney CIT Decision Letter, Amended ("Exhibit R" to Defendants' Motion for Summary Judgment), at p. 1, at App'x Vol. 4, at p. 983; Unsworn Declaration of Captain Shelley Bryant ("Exhibit S" to Defendants' Motion for Summary Judgment), at ¶¶ 3-4, at App'x Vol. 4, at pp. 996-997.

27.    PPD was designated as the lead investigative agency. *See* Exhibit R to Defendants' Motion for Summary Judgment, at p. 1, at App'x Vol. 4, at p. 983; Exhibit

S to Defendants' Motion for Summary Judgment, at ¶¶ 3, 4, at App'x Vol. 4, at pp. 996-997.

28.     PPD, as the lead investigating agency, was authorized to utilize PCSO personnel and resources in accordance with the CIT protocol. *See* Exhibit S to Defendants' Motion for Summary Judgment, at ¶¶ 3-7, at App'x Vol. 4, at pp. 996-997; Shelley Bryant Deposition ("Exhibit T" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 1001 (p. 49, ll. 20-25), App'x Vol. 4, at p. 1002 (p. 50, l. 1, ll. 19-22), App'x Vol. 4, at p. 1003 (p. 51, ll. 1-4), App'x Vol. 4, at p. 1004 (p. 63, l. 25), App'x Vol. 4, at p. 1005 (p. 64, ll. 1-19).

29.     Both PCSO deputies and PPD officers verified the scene was secured at 3:42:33 p.m. *See* Exhibit Q to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at pp. 974-982; PCSO Call Detail Report ("Exhibit U" to Defendants' Motion for Summary Judgment), at App'x Vol. 5, at p. 1014.

30.     Stacy Hoff ("Hoff") had an unobstructed view of the interaction between Ward and Deputies McWhorter and Gonzales from just feet away. *See* Exhibit H to Defendants' Motion for Summary Judgment, at 1:35-2:18.

31.     Witnesses confirmed that Ward was resisting detention and fighting the deputies, that the struggle with Deputy McWhorter was violent, and that Ward was attempting to remove Deputy McWhorter's firearm from its holster. *See* Exhibit H to

20

Defendants' Motion for Summary Judgment, at *passim*; *see also* PPD Case Supplemental Report by Detective Ryan Torres ("Exhibit V" to Defendants' Motion for Summary Judgment), at Ward 000183, at App'x Vol. 5, at p. 1038.

32.    To ensure the safety of the officers and others and preserve the now active crime scene, Deputies McWhorter and Gonzales ordered Plaintiff and Tommy Brown ("Mr. Brown") to remain in the Vehicle immediately following the OIS. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 1:38-1:42, 2:50-2:55; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 914 (p. 251, ll. 13-18), App'x Vol. 4, at p. 915 (p. 252, ll. 14-19), App'x Vol. 4, at p. 917 (p. 267, ll. 8-15).

33.    Once Ward was removed from the Vehicle, neither Plaintiff nor the Vehicle's driver, Mr. Brown, could see the fight between Ward and the deputies, Deputy McWhorter's use of deadly force, or the events immediately preceding the OIS. *See* Exhibit K to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 945 (p. 122, ll. 21-25), App'x Vol. 4, at p. 946 (p.123, ll. 1-19), App'x Vol. 4, at p. 947 (p. 141, ll. 24-25), App'x Vol. 4, at p. 948 (p. 142, ll. 1-5), App'x Vol. 4, at p. 949 (p. 173, ll. 14-25), App'x Vol. 4, at p. 950 (p. 174, ll. 1-6); Tommy Brown Deposition ("Exhibit W" to Defendants' Motion for Summary Judgment), at App'x Vol. 5, at p. 1044 (p. 74, ll. 6-15), App'x Vol. 5, at p. 1045 (p. 77, l. 25), App'x Vol. 5, at p. 1046

21

(p. 78, ll. 1-19), App'x Vol. 5, at p. 1047 (p. 107, ll. 14-20), App'x Vol. 5, at p. 1048 (p. 108, ll. 22-25), App'x Vol. 5, at p. 1049 (p. 109, ll. 1-19).

34.     At the time of the OIS, Deputy McWhorter's investigation into suspected criminal activity had not concluded. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 00:00-2:25; Exhibit C to Defendants' Motion for Summary Judgment, at 00:00-00:45; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 905 (p. 181, ll. 6-12).

35.     After the scene was verified as secured at 3:42:33 p.m., Plaintiff, Kristy Ward Stamp, was removed from the Vehicle at approximately 3:44:45 p.m. and, for officer safety, was placed in handcuffs pending further investigation by PPD. *See* Exhibit Q to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at pp. 974-982; Exhibit S to Defendants' Motion for Summary Judgment, at ¶¶ 5-8, at App'x Vol. 4, at p. 997; Exhibit U to Defendants' Motion for Summary Judgment, at App'x Vol. 5, at pp. 1012-1036; Berumen BWC ("Exhibit X" to Defendants' Motion for Summary Judgment), at 9:40-10:02 (Conventionally Submitted); Nicolas Berumen Deposition ("Exhibit Y" to Defendants' Motion for Summary Judgment), at App'x Vol. 5, at p. 1054 (p. 163, ll. 8-21), App'x Vol. 5, at p. 1055 (p. 164, ll. 16-25).

36.     CIT made the decision to detain Plaintiff and directed PCSO to detain Plaintiff pending further investigation. *See* Exhibit S to Defendants' Motion for

Summary Judgment, at ¶ 8, at App'x Vol. 4, at p. 997; Exhibit T to Defendants'

Motion for Summary Judgment, at App'x Vol. 4, at p. 1001 (p. 49, ll. 20-25), App'x

Vol. 4, at p. 1002 (p. 50, l. 1, ll. 19-22), App'x Vol. 4, at p. 1003 (p. 51, ll. 1-4), App'x,

Vol. 4, at p. 1004 (p. 63, ll. 18-25), App'x Vol. 4, at p. 1005 (p. 64, ll. 1-25), App'x

Vol. 4, at p. 1006 (p. 65, ll. 1-7), App'x Vol. 4, at p. 1007 (p. 67, ll. 13-25), App'x Vol.

4, at p. 1008 (p. 68, ll. 1-22), App'x Vol. 4, at p. 1009 (p. 84, ll. 16-25); Exhibit Y to

Defendants' Motion for Summary Judgment, at App'x Vol. 5, at p. 1055 (p. 164, ll. 2-

12); Executive Summary ("Exhibit Z" to Defendants' Motion for Summary

Judgment), at App'x Vol. 5, at p. 1057.

37.     When placing Plaintiff in handcuffs, Deputy Berumen told Plaintiff,

"you're just a passenger being detained, you're not under arrest, nothing like that."

*See* Exhibit X, at 9:45-9:55.

38.     The Vehicle and its immediate vicinity remained an active crime scene.

*See* Exhibit T to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p.

1010 (p. 108, ll. 16-18).

39.     At this time, the temperature in Pueblo, Colorado was approximately 17°

Fahrenheit, and it was beginning to snow. *See* February 22, 2022 Weather History in

Pueblo, Colorado ("Exhibit AA" to Defendants' Motion for Summary Judgment), at

App'x Vol. 5, at pp. 1058-1072.

40.     Plaintiff was placed, first, in Deputy Christine Spencer's ("Deputy Spencer") PCSO vehicle to stay warm pending further investigation by PPD, as she could no longer remain in the Vehicle and the temperatures outside were below freezing. *See* Exhibit T to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 1010 (p. 108, ll. 16-18); Exhibit AA to Defendants' Motion for Summary Judgment, at App'x Vol. 5, at pp. 1058-1072; Deputy Report for Incident – Spencer ("Exhibit BB"), at p. 1, at App'x Vol. 5, at p. 1073.

41.     When Deputy Spencer was assigned elsewhere, Plaintiff was moved to Deputy Mahan's PCSO vehicle pending further investigation by PPD. *See* Exhibit BB to Defendants' Motion for Summary Judgment, at App'x Vol. 5, at pp. 1073-1074.

42.     CIT issued an order to PCSO command staff to transport Mr. Brown and Plaintiff to the PCSO Annex, where members of the investigative unit were waiting to question them concerning the circumstances preceding and surrounding the OIS. *See* Exhibit S to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at 996-997; Exhibit T to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 1001 (p. 49, ll. 20-25), App'x Vol. 4, at p. 1002 (p. 50, l. 1, ll. 19-22), App'x Vol. 4, at p. 1003 (p. 51, ll. 1-4), App'x Vol. 4, at p. 1004 (p. 63, ll. 18-25), App'x Vol. 4, at p. 1005 (p. 64, ll. 1-25), App'x Vol. 4, at p. 1006 (p. 65, ll. 1-7), App'x Vol. 4, at p. 1007 (p. 67, ll. 13-25), App'x Vol. 4, at p. 1008 (p. 68, ll. 1-22), App'x Vol. 4, at p. 1009 (p.

84, ll. 16-25); Exhibit Y to Defendants' Motion for Summary Judgment, at App'x Vol. 5, at p. 1055 (p. 164, ll. 2-12).

43.     Plaintiff was released from her handcuffs upon entering the PCSO Annex interview room at approximately 4:33:56 p.m. *See* ECF 131, at ¶ 48, at App'x Vol. 2, p. 316.

44.     Plaintiff was interviewed concerning her involvement in the suspected criminal activity and subsequent OIS. *See* ECF at 131, at ¶ 52, at App'x Vol. 2, p. 317.

45.     PPD, not PCSO, seized the Vehicle and Plaintiff's cell phone. *See* Applications and Affidavits for Search Warrants, various dates ("Exhibit CC" to Defendants' Motion for Summary Judgment), at *passim*, at App'x Vol. 5, at pp. 1075-1101.

46.     PPD ID Detective John Guerrero processed the scene on February 22, 2022, the date of the OIS. *See* Exhibit CC to Defendants' Motion for Summary Judgment, at pp. 5, 12, 19, at App'x Vol. 5, at pp. 1079, 1086, 1093.

47.     On the date of the OIS, Detective Guerrero observed two cell phones inside of the Vehicle; one of which was a Motorola with a pink and black case, belonging to Plaintiff. *Id*.

48.     Following the OIS, the Vehicle was towed to Pueblo Police Department, 200 S. Main St., Pueblo, CO., at the direction of PPD and held in a secured ID bay.

*Id*.; *see also* Exhibit S to Defendants' Motion for Summary Judgment, at ¶¶ 3, 4, at App'x Vol. 4, at pp. 996-997.

49.    On March 2 and March 14, 2022, judicially authorized warrants were issued to seize and search the Vehicle and Plaintiff's cell phone, respectively. *See* Exhibit CC to Defendants' Motion for Summary Judgment, at *passim*, at App'x Vol. 5, at pp. 1075-1101.

50.    The Application and Affidavit for Search Warrant(s) were executed by Detective Jose Medina of PPD, not by PCSO personnel. *Id*.

51.    PPD seized and possessed the Vehicle and cell phone prior to the issuance of the judicially authorized warrants. *Id*.

52.    PPD continued to possess the Vehicle and cell phone after the issuance of the judicially authorized warrants. *Id*.

53.    PCSO, including Defendants, did not seize, or hold, the Vehicle or Plaintiff's cell phone. *Id*.

## V.    SUMMARY OF THE ARGUMENT

Defendants are entitled to qualified immunity on Plaintiffs' First, Fourth, and Sixth Claims for Relief. Reaching its decision, the district court utilized the incorrect method of distinct factual analysis relative to the question of Defendants' entitlement to qualified immunity.  Instead, of "… determin[ing] whether [P]laintiffs['] factual

26

allegations [we]re sufficiently grounded in the record…," pursuant to the analytic framework intended for summary judgment motions predicated upon issues of qualified immunity, the district court, instead, "… determine[d] … [P]laintiff[s] survive[d] summary judgment because [P]laintiffs['] evidence raise[d] material issues that warrant resolution by a jury." *Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015) (brackets added) citing *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring); *see also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 940 n. 6 (10th Cir. 2008). The analytic framework relied upon by the district court *as applied* is intended, only, for traditional summary judgment motions.

Unlike other motions for summary judgment where the moving party carries the burden of proof to demonstrate that there are no genuine issues of material fact, when a defendant has asserted the defense of qualified immunity, the burden then shifts to the plaintiff to prove that the defendant claiming such a defense is not entitled to qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) citing *Nelson v. McMullen*, 207 F.3d 1202, 1205-06 (10th Cir. 2000); *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000). "Qualified immunity having been claimed, 'the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of defendant's unlawful conduct.'" *Davis v. Clifford*, 825 F.3d

1131, 1135 (10th Cir. 2016) citing *Estate of Booker v. Gomez,* 745 F.3d 405, 411 (10th Cir. 2014).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "And plaintiffs may not identify their claim through 'extremely abstract rights' because this would convert the rule of qualified immunity 'into a rule of virtually unqualified liability.'" *Surat v. Klamser*, 52 F.4th 1261, 1276 (10th Cir. 2022). The United States Supreme Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Mullenix*, 577 U.S. at 12. The United States Supreme Court "… ha[s] repeatedly told courts … not to define clearly established law at a high level of generality." *Id*.

The district court's order, finding that the law was "clearly established" at the time of the alleged violation of Ward's rights, relied upon two cases to reach its conclusion: *Est. of Harmon v. Salt Lake City*, No. 23-4125, --- F.4th ----, 2025 WL 1163268, at *7 (10th Cir. Apr. 22, 2025) and *Clerkley v. Holcomb*, 121 F.4th 1359, 1367 (10th Cir. 2024). Both cases, one unpublished, post-date the alleged incident giving rise to this matter, failing to demonstrate that "… the right was clearly established *at the time of defendant's unlawful conduct*.'" *Davis*, 825 F.3d at 1135

28

(emphasis added); *see also Surat*, 52 F.4th at 1279 ("…[W]e have repeatedly explained that clearly established law may not be based on our unpublished decisions"). The district court's reliance upon the two aforementioned cases, and lack of reliance upon alternative cases cited by Plaintiffs, demonstrates that it was not clearly established that the Fourth Amendment prohibited Defendants' conduct in the specific situation they confronted.

Concerning the alleged violation of Plaintiff's constitutional rights, Plaintiff's temporary detention and transport to the PCSO Annex pending further investigation, due to her location *inside of* the crime scene and the presence of below freezing temperatures and snowfall, do not otherwise convert her temporary seizure into an arrest. The crime scene, and inclement and dangerous weather, were not in Defendants' control. Defendants' transportation of Plaintiff served "… reasonable means of achieving the legitimate goals of the detention given the specific circumstances of the case." *United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009) citing *United States v. Charley*, 396 F.3d 1074, 1080 (9th Cir. 2005).

Finally, notwithstanding the district court's reliance upon, and utilization of, the incorrect analytic framework intended for traditional summary judgment motions, the "version of events" the district court held a reasonable jury could credit are "blatantly contradicted by the record." The true facts, demonstrated by and supported in the

record, entitle Defendants to qualified immunity.

## VI.  STANDARD OF REVIEW

The Tenth Circuit Court of Appeals "… review[s] the denial of a summary judgment motion raising qualified immunity questions *de novo*, and 'construe[s] the record in the light most favorable to the nonmoving party." *York v. City of Las Cruces*, 23 F.3d 1205, 1210 (10th Cir. 2008) (internal citations omitted) citing *Medina*, 252 F.3d at 1128; *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008). "Because of the underlying purposes of qualified immunity, [the Tenth Circuit Court of Appeals] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina*, 252 F.3d at 1128 (brackets added).

> After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff. Applying the same standards as the district court, [the Tenth Circuit Court of Appeals] must determine whether the plaintiff has satisfied a 'heavy two-part burden.' The plaintiff must first establish 'that the defendant's actions violated a constitutional or statutory right.' If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct.

*Id*. (brackets added) (internal citations omitted).

"As with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York*, 23 F.3d at 1210 citing *Scott v. Harris*, 550 U.S. 372, 380 (2007). In such a circumstance, "… when the 'version of events' the district court holds a reasonable jury could credit is blatantly contradicted by the record,' [the Tenth Circuit Court of Appeals] may assess the case based on [its] own de novo view of which facts a reasonable jury could accept as true." *Henderson*, 813 F.3d at 948.

## VII.  ARGUMENT

### 1.    The District Court utilized the incorrect method of distinct factual analysis relative to the question of Defendants' entitlement to qualified immunity.

"At the summary judgment stage, a federal court's factual analysis relative to the qualified immunity issue is distinct:

> [T]he objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are *sufficiently grounded in the record* such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court.

*Cox*, 800 F.3d at 1243 (emphasis added) citing *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring); *see also United States ex rel. Burlbaw*, 548 F.3d at 940 n. 6 ("exhorting courts to 'exercise care not to confuse the two analytic frameworks' of qualified immunity and traditional summary judgment, though acknowledging that, 'at

31

least in some instances, this … is easier said than done'") It is only *after* plaintiff crosses the legal hurdle comprised of his or her two-part burden of demonstrating the violation of a constitutional right that was clearly established, that courts should be concerned with the *true* factual landscape – as opposed to the factual landscape as plaintiff would have it." *See Thomson*, 584 F.3d at 1326 (Holmes, J., concurring) (emphasis in original). "Based upon that true factual landscape, courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law." *Id.*

Defendants' Motion for Summary Judgment sought summary judgment in Defendants' favor *on each of Plaintiffs' claims*, including those to which Defendants could not raise the defense of qualified immunity. The District Court, however, conducted only a singular analysis pursuant to the analytic framework of traditional summary judgment motions, finding that "… a reasonable jury could find Mr. Ward's rights were violated, based on … material factual disputes as to the use of objectively unreasonable force against him." Order, at pp. 16-17, App'x Vol. 6, at p. 1352-1353. The Court's singular analysis of all claims, utilizing the traditional summary judgment standard, deprived Defendants of the defense of qualified immunity. *See* e.g. Order, at p. 11, App'x Vol. 6, at 1347 ("There is a sufficient dispute of genuine material fact as

to whether, for instance, Mr. Ward reached for Deputy McWhorter's gun … or Mr. Ward tackled Deputy McWhorter in such a manner that justified the use of lethal force against him…"); ("…there are material factual disputes as to what Mr. Ward was or was not doing at the time he was shot"); p. 12, App'x Vol. 6, at 1348 ("In light of the material factual disputes that Plaintiff creates, and because a reasonable factfinder could conclude the use of force against Mr. Ward was excessive and objectively unreasonable, the Court declines to grant summary judgment…"). The singular analytic framework relied upon by the district court concerning Defendants' traditional summary judgment *and* qualified immunity arguments permitted Plaintiffs to elude their heavy two-part burden required to overcome qualified immunity. *See Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) ("To overcome qualified immunity, a plaintiff must show (1) facts that demonstrate the officials violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct"); *Medina*, 252 F.3d at 1130 ("Consequently, in order for [a plaintiff's] claim to survive summary judgment, *the record must contain facts that rebut the presumption of the officers' immunity from suit*").

## 2.    The law prohibiting Defendants' alleged conduct was not clearly established at the time of the alleged violation of Ward's constitutional rights.

"The doctrine of qualified immunity shields officials from civil liability so long

as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix*, 577 U.S. at 11. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id*. "And plaintiffs may not identify their claim through 'extremely abstract rights' because this would convert the rule of qualified immunity 'into a rule of virtually unqualified liability.'" *Surat*, 52 F.4th at 1276. The United States Supreme Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Mullenix*, 577 U.S. at 12. "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id*.

The United States Supreme Court "… ha[s] repeatedly told courts … not to define clearly established law at a high level of generality." *Id*.

> The dispositive question is 'whether the violative nature of *particular* conduct is clearly established. This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'

*Id*.

For example, in *Mullenix*, *supra*,

34

… the Fifth Circuit held that Mullenix violated the clearly established rule that a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.' Yet this Court has previously considered—and rejected—almost that exact formulation of the qualified immunity question in the Fourth Amendment context. In *Brosseau,* which also involved the shooting of a suspect fleeing by car, the Ninth Circuit denied qualified immunity on the ground that the officer had violated the clearly established rule, set forth in *Tennessee v. Garner,* 471 U.S. 1 … (1985), that 'deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.' This Court summarily reversed, holding that use of *Garner*'s 'general' test for excessive force was 'mistaken.' The correct inquiry, the Court explained, was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight.' The Court considered three court of appeals cases discussed by the parties, noted that 'this area is one in which the result depends very much on the facts of each case,' and concluded that the officer was entitled to qualified immunity because '[n]one of [the cases] *squarely governs* the case here.'

*Id*. (internal citations omitted) (ellipses added). "Moreover, to establish that a right is clearly established under the 'weight of authority' standard, a plaintiff must identify more than 'a handful of decisions … that lend support to his claim.'" *Surat*, 52 F.4th at 1279.

In this matter, even when viewing the true facts in a light most favorable to Plaintiffs, it was not clearly established that the Fourth Amendment prohibited Defendants' conduct in the situation they confronted: whether to shoot a suspect under

the influence of drugs and/or alcohol, who told officers he might have a knife, after the suspect concealed his actions to destroy evidence, resisted his detention, tackled and wrestled with a deputy for more than twenty (20) seconds, headbutted the deputy, failed to respond to verbal commands or submit to pain compliance techniques, and the officer believed the suspect was attempting to disarm him in a middle school parking lot as children were, imminently, to be released from school.

The district court's order, with respect to the "clearly established" prong of its qualified immunity analysis concerning an alleged violation of Ward's Fourth Amendment rights, provides only the following: "For instance, a reasonable jury could find Mr. Ward's rights were violated, based on – at a minimum – material factual disputes as to the use of objectively unreasonable force against him, *and that his right to be free from the use of excessive force is clearly established*. *See e.g. Est. of Harmon*, 2025 WL 1163268, at *7 (10th Cir. Apr. 22, 2025); *Clerkley v. Holcomb*, 121 F.4th 1359, 1367 (10th Cir. 2024)."

As an initial matter, clearly established law may not be based on unpublished opinions of the Tenth Circuit Court of Appeals. *See Surat*, 52 F.4th at 1279. ("…[W]e have repeatedly explained that clearly established law may not be based on our unpublished decisions") citing *William v. Hansen*, 5 F.4th 1129, 1132-33 (10th Cir. 2021) in turn citing *Green v. Post*, 574 F.3d 1294, 1305 n.10 (10th Cir. 2009) ("In

determining whether the law was clearly established, we have held that we may not rely upon unpublished decisions"). "Where 'unpublished opinions are not even regarded as binding precedent in our circuit … [the Tenth Circuit Court of Appeals] c[an]not allow liability to be imposed upon public officials based upon unpublished opinions that [the Court of Appeals itself] ha[s] determined will be binding only upon the parties immediately before the court.'" *Id*. citing *Green*, 574 F.3d at 1305 n.10.

Further, the second prong of the qualified immunity analysis requires a demonstration "… that the right was clearly established *at the time of the alleged unlawful activity*." *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018). "A Government official's conduct violates clearly established law when, *at the time of the challenged conduct*, '[t]he contours of a right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-kidd*, 563 U.S. 731, 741 (2011). "… *[E]xisting precedent* must have placed the statutory or constitutional question beyond debate." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) (emphases added and omitted).

In its Order, the district court relied upon *Harmon*, an unpublished opinion issued April 22, 2025, and *Clerkley*, issued November 26, 2024, to demonstrate that the law was "clearly established." Both opinions, one unpublished, were issued years *after* the alleged incident giving rise to this matter occurred (February 22, 2022),

37

failing to demonstrate "… that the right was clearly established *at the time of the alleged unlawful activity*." *Perry*, 892 F.3d at 1121. The district court's reliance on *Harmon* and *Clerkley*, alone, is sufficient to establish that Plaintiffs failed to meet their burden to demonstrate that the law prohibiting Defendants' alleged conduct was clearly established at the time of the alleged violation of Ward's Fourth Amendment rights.

Notwithstanding the above, Plaintiffs' alternative cases, not relied upon or cited by the district court in its Order, fail to establish that the constitutional right asserted here was clearly established at the time of the alleged conduct. *See* Plaintiffs' Response to Defendants' Motion for Summary Judgment [Doc. 150], at p. 17 citing *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) (a case in which "… officers … shot a suicidal man holding a knife … [who] posed a danger only to himself"); *Estate of Harmon v. Salt Lake City*, 2021 U.S. App. Lexis 39942 (10th Cir. Nov. 10, 2021), an unpublished opinion which courts may not rely on to demonstrate clearly established law; *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009) (a case in which a motorist's estate filed a § 1983 action alleging that a police officer and city violated motorist's Fourth Amendment rights by using excessive force to terminate police chase by fatally shooting motorist); *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019) (a case in which the estate of a homeowner, his wife, and children brought

38

§ 1983 action against a police officer and city, alleging that the officer used excessive force in fatally shooting a homeowner who had a baseball bat and was "acting crazy" in the home's driveway, after the homeowner began to walk towards the officers with a baseball bat, despite the officers' opportunity to retreat); *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) (a case in which a City's alleged failure to train its officers led to officers leaving cover, approaching a known armed and upset person to disarm said upset person, predictably leading to a violent response); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007) (a case in which an individual contesting a traffic ticket inadvertently removed a file from the courthouse after returning to his vehicle to retrieve money for the fine, was accosted and tackled by police, despite his lack of resistance or aggression towards officer); *Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995) (a case in which the parents of person killed in confrontation with police brought § 1983 action against officers after they shot a suicidal man who was, allegedly, holding a knife by his side, who, it is undisputed, made no contact with officers); *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) an unpublished opinion which courts may not rely on to demonstrate clearly established law; *Smith v. Ray*, 781 F.3d 95 (4th Cir. 2015) (A Fourth Circuit case in which a woman, who at most, was suspected of the misdemeanor of contributing to delinquency of a minor, was grabbed by a larger male officer when she neither fled, nor turned her back on

him, after she took a single step off a porch); *Cantu v. City of Dothan*, 974 F.3d 1217

(11th Cir. 2020) (An Eleventh Circuit case in which an individual who struggled with

officers against his car and attempted to flee, and shouted: "No! Stop! Stop! Stop!

Stop! Let go! Stop! Stop! My children are in the car. You're hurting me! Stop ... There

ain't nothing happened. Ain't no crime been committed ... Look at what you done to

my children" and so on," was shot by police); *Est. of Armstrong v. Village of*

*Pinehurst*, 810 F.3d 892 (4th Cir. 2016) (a Fourth Circuit case in which an individual

suffering from mental illness and judged a danger to himself, who was holding on to a

post and was surrounded by six individuals, was tased five separate times after he

refused to let go of the post).

    None of the cases cited by Plaintiffs, whether published or unpublished, from

this Circuit or occurring elsewhere, evidenced in part by the district court's omission

of the cited cases from its Order, clearly establish that the Fourth Amendment

prohibited Defendants' conduct in the situation they confronted: whether to shoot a

suspect under the influence of drugs and/or alcohol, who told officers he might have a

pocket knife, after the suspect concealed his actions to destroy evidence, resisted his

detention, tackled and wrestled with a deputy for more than twenty (20) seconds,

headbutted the deputy, failed to respond to verbal commands or submit to pain

compliance techniques, and the deputy believed the suspect was attempting to disarm

him in a middle school parking lot as children were, imminently, to be released from school. "… [B]ecause 'none of the cases [cited by Plaintiffs] *squarely govern*[ ] the case here," Defendants McWhorter and Gonzales are entitled to qualified immunity for their use of force.

### 3. *The facts that the district court ruled a reasonable jury could find, even when viewed in a light most favorable to Plaintiff, do not suffice to show a violation of Kristy Ward Stamp's constitutional rights.*

"[T]here is some latitude for police to detain where 'the intrusion on citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable." *Bailey v. U.S.*, 568 U.S. 186, 193 (2013). The use of forceful techniques or measures, such as handcuffs, does not necessarily transform an investigative detention into an arrest. *Maresca v. Bernalillo County,* 804 F.3d 1301, 1308-09 (10th Cir. 2015) ("The deputies accurately point out 'that the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a terry detention into a full custodial arrest'"). Law enforcement officers may use forceful measures, even during an investigative stop, when reasonably necessary. *United States v. Merkley,* 988 F.2d 1062, 1063-64 (10th Cir. 1993). This is, of course, in line with the Supreme Court's finding that detention or control of both suspects and non-suspects "… may be necessary to ensure officer safety and to maintain the

officers' control over a crime scene so long as the steps are reasonably necessary to protect their safety and to maintain the status quo." *United States v. Hensley,* 469 U.S. 221, 235 (1985).

> The Supreme Court has acknowledged that 'there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigative detention.' *Royer,* 460 U.S. at 504 …; *see also …Charley,* 396 F.3d … [at] 1080 … (noting 'that there may be certain, case-specific circumstances where law enforcement officers can move a suspect from one location to another without crossing the line between investigative stop and an arrest,' citing supporting treatise and case law); 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.2(g) (4th ed. 2004) ('[I]t seems clear that some movement of the suspect in the general vicinity of the stop is permissible without converting what would otherwise be a temporary seizure into an arrest.'). Further, 'police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention given the specific circumstances of the case.' *Charley,* 396 F.3d at 1080 (quotations omitted); *United States v. Gori,* 230 F.3d 44, 56 (2d Cir. 2000) ("[I]t is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop.').

*White*, 584 F.3d at 953.

In this matter, for the sole and limited purposes of this appeal, it is undisputed that Plaintiff was removed from the Vehicle following the OIS, placed in handcuffs at approximately 3:45 p.m., and allowed to remain in a PCSO vehicle prior to her transport to the PCSO Annex pending further investigation by CIT. Plaintiff arrived at the PCSO Annex and was released from handcuffs at approximately 4:33 p.m. She

was interviewed regarding the OIS and preceding events, and departed the PCSO Annex at approximately 6:29 p.m. At the time of the OIS, it was approximately 17° Fahrenheit, and it had begun to snow. Plaintiff's temporary detention and transport to the PCSO Annex pending further investigation, due to her location *inside of* the crime scene and the presence of below freezing temperatures and snowfall, do not otherwise convert her temporary seizure into an arrest. The crime scene, and inclement and dangerous weather, were not in Defendants' control. Defendants' transportation of Plaintiff served "… reasonable means of achieving the legitimate goals of the detention given the specific circumstances of the case." *White*, 584 F.3d at 953 citing *Charley*, 396 F.3d at 1080. Because Plaintiffs failed to demonstrate Defendants violated Plaintiff's Fourth Amendment rights, they are entitled to qualified immunity.

### 4.    *The version of events the district court held a reasonable jury could credit are blatantly contradicted by the record.*

"… [W]hen the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' [the Tenth Circuit Court of Appeals] may assess the case based on [its] own de novo view of which facts a reasonable jury could accept as true." *Henderson*, 813 F.3d at 948. This standard is satisfied when "'… the version of events is so utterly discredited by the record that no reasonable jury could have believed' it, constituting 'visible fiction.'" *Vette v. K-9*

43

*Unit Deputy Sanders*, 989 F.3d 1154, 1164 (10th Cir. 2021). A defendant may demonstrate "visible fiction" by first, presenting sworn testimony or credible evidence in his favor and, second, showing that a plaintiff has presented no record evidence to the contrary. *See Henderson*, 813 F.3d at 950-51 (determining that the district court's findings were blatantly contradicted by the record because "[t]he record indicate[d] that, when DO Thomas left to deliver the gurney for the medical emergency, he knew only that Ms. Henderson was in the tub room and that DO Johnson was in the medical unit outside the tub room. DO Thomas testified that he believed the door to the tub room was locked when he left. *Ms. Henderson presented no evidence to the contrary* … These undisputed record facts blatantly contradict the district court's factual determination that DO Thomas could have been subjectively aware of a substantial risk of bodily harm to Ms. Henderson").

Though the district court did *not* conduct an independent factual analysis relative to the question of qualified immunity, the district court did find, albeit utilizing only the analytic framework proper for traditional summary judgment motions, that,

> [t]here is a sufficient dispute of genuine material fact as to whether, for instance, Mr. Ward reached for Deputy McWhorter's gun, *see* ECF No. 156 at 15, or Mr. Ward "tackled" Deputy McWhorter in such a manner that justified the use of lethal force against him, ECF No. 150 at 16. Thus, a reasonable jury could conclude this factor—the "most important"

44

> *Graham* factor—does not favor Defendants, underscoring the impropriety of granting Defendants summary judgment, particularly where, at a bare minimum, there are material factual disputes as to what Mr. Ward was or was not doing at the time he was shot.

Order, at p. 11, App'x Vol. 6, at p. 1347. The district court continued, concluding that "a reasonable jury could find that Mr. Ward made no hostile movements that rise to the level of 'resisting' detention, or that he manifested any intention to flee, justifying the use of deadly force against him." *Id*. at p. 12, App'x Vol. 6, at p. 1348.

The district court's findings, above, are blatantly contradicted by the record. In their Motion for Summary Judgment, Defendants presented, in pertinent part, the following Statement(s) of Undisputed Material Fact ("SUMF"):

14.    Ward tackled Deputy McWhorter. *See* Exhibit B to Defendants' Motion for Summary Judgment, at 2:25-2:35; Exhibit C to Defendants' Motion for Summary Judgment, at 00:45-00:55; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, p. 916 (p. 261, ll. 8-13); BWC screenshots 2 ("Exhibit I" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 939-941.

18.    Ward continued to fight Deputy McWhorter, despite Deputy Gonzales' use of pain compliance techniques. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 00:50-1:02; BWC screenshots 3 ("Exhibit L" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 952.

19.    Ward headbutted Deputy McWhorter, causing Deputy McWhorter to suffer serious bodily injury. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 3:3:10, 3:20-3:28; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 919 (p. 314, ll. 1-12); Photographs of Deputy McWhorter ("Exhibit M" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, pp. 953-961; Parkview Medical Records ("Exhibit N" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at pp. 962-969; Physician's Report of Worker's Compensation Injury ("Exhibit O" to Defendants' Motion for Summary Judgment), at App'x Vol. 4, at p. 970.

20.    During the fight, Ward grabbed onto Deputy McWhorter's duty belt, holster, and firearm. *See* Exhibit C to Defendants' Motion for Summary Judgment, at 3:00-3:10; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, p. 912 (p. 229, ll. 23-25), App'x Vol. 4, p. 913 (p. 230, l. 1.), App'x Vol. 4, p. 916 (p. 261, ll. 8-13); Exhibit G to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 934 (p. 185, ll. 4-18), App'x Vol. 4, at p. 935 (p. 186, ll. 8-19), App'x Vol. 4, at p. 936 (p. 187, ll. 18-25), App'x Vol. 4, at p. 937 (p. 188, ll. 1-8); Exhibit H to Defendants' Motion for Summary Judgment, at 6:27-7:30.

21.    Deputy McWhorter reasonably believed Ward was trying to draw his firearm from its holster. *See* Exhibit C to Defendants' Motion for Summary Judgment,

at 3:00-3:10; Exhibit D to Defendants' Motion for Summary Judgment, at App'x Vol. 4, at p. 912 (p. 229, ll. 23-25), App'x Vol. 4, at p. 913 (p. 230, l. 1), App'x Vol. 4, at p. 916 (p. 261, ll. 8-13).

31.    Witnesses confirmed that Ward was resisting detention and fighting the deputies, that the struggle with Deputy McWhorter was violent, and that Ward was attempting to remove Deputy McWhorter's firearm from its holster. *See* Exhibit H to Defendants' Motion for Summary Judgment, at *passim*; *see also* PPD Case Supplemental Report by Detective Ryan Torres ("Exhibit V" to Defendants' Motion for Summary Judgment), at Ward 000183, at App'x Vol. 5, at p. 1038.

46.    PPD ID Detective John Guerrero processed the scene on February 22, 2022, the date of the OIS. *See* Exhibit CC to Defendants' Motion for Summary Judgment, at pp. 5, 12, 19, at App'x Vol. 5, at pp. 1079, 1086, 1093.

47.    On the date of the OIS, Detective Guerrero observed two cell phones inside of the Vehicle; one of which was a Motorola with a pink and black case, belonging to Plaintiff. *Id.*

48.    Following the OIS, the Vehicle was towed to Pueblo Police Department, 200 S. Main St., Pueblo, CO., at the direction of PPD and held in a secured ID bay. *Id.*; *see also* Exhibit S to Defendants' Motion for Summary Judgment, at ¶¶ 3, 4, at App'x Vol. 4, at pp. 996-997.

49.    On March 2 and March 14, 2022, judicially authorized warrants were issued to seize and search the Vehicle and Plaintiff's cell phone, respectively. *See* Exhibit CC, at passim, at App'x Vol. 5, pp. 1075-1101.

50.    The Application and Affidavit for Search Warrant(s) were executed by Detective Jose Medina of PPD, not by PCSO personnel. *Id*.

51.    PPD seized and possessed the Vehicle and cell phone prior to the issuance of the judicially authorized warrants. *Id*.

52.    PPD continued to possess the Vehicle and cell phone after the issuance of the judicially authorized warrants. *Id*.

Plaintiffs' Response(s) to Defendants' Statement(s) of Undisputed Fact ("RSUF") are as follows:

14.    "**Deny.** Mr. Ward did not tackle Defendant McWhorter. As Defendants' citations demonstrate, while Mr. Ward was on the ground (having been thrown there by Defendants), he wrapped an arm around Defendant McWhorter's leg in an effort to prevent Defendant McWhorter from further unlawfully assaulting him."

18.    "Admit that Mr. Ward briefly wrestled with McWhorter in order to defend himself against the unlawful assault committed by Defendants McWhorter and Gonzales."

19.    "**Deny.** Mr. Ward did not headbutt Defendant McWhorter. No other

witness, including Defendant Gonzales, reported observing a headbutt. *See* **Ex. 10**, Gonzales Dep., 126:8-19 [at App'x Vol. 5, at p. 1159]. Neither Defendant McWhorter's body worn camera nor Defendant Gonzales' body worn camera captured any alleged headbutt by Mr. Ward. *See* **Ex. 2,** Gonzales BWC, 00:00-1:05; **Ex. 4,** McWhorter BWC, 2:20-2:47." (Conventionally Submitted)

20-21. "**Deny.** *This is one of the most disputed facts in the case*, rendering summary judgment impossible**.** There is no evidence that Mr. Ward ever grabbed McWhorter's holster aside from McWhorter's own self-serving statements. Defendant Gonzales vigorously denied that she ever saw Mr. Ward grab McWhorter's holster or firearm. *See* **Ex. 11,** Gonzales CIT Interview Trans., pp. 8-9 [App'x Vol. 5, at p. 1165-1166]. Neither Defendant Gonzales' body worn camera nor Defendant McWhorter's body worn camera captured *any hint* of this alleged grab; tellingly, Defendants do not cite any body-worn camera footage from the time period during which McWhorter claims Mr. Ward attempted to disarm him. *See* **Ex. 2,** Gonzales BWC, 00:51-01:06. McWhorter also proclaimed his absolute confidence that the locking mechanism on his holster was engaged at the time. *See* **Ex. 5,** McWhorter Deposition, 134:1-12 [at App'x Vol. 5, at p. 1139]; **Ex. 8,** McWhorter CIT Interview, pp. 13-14; 56-57 [at App'x Vol. 5, at p. 1151-1152; 1154-1155]. As such, McWhorter could not reasonably have believed that he was about to be disarmed by Mr. Ward. *See* **Ex. 12**,

Police Practices Expert Report of Roger Clark, pp. 34-37 App'x Vol. 5, at p. 1200-1203]."

31.    "**Deny.** Neither Ms. Hoff nor Valencia had a vantage point that would have allowed them to see whether Mr. Ward attempted to grab McWhorter's firearm in its holster. **Ex. 20,** Hoff Interview, 5:00-5:11; 7:43-8:19. Indeed, Valencia took a video from his vantage point that shows he could not have seen details of Defendants' assault on Mr. Ward. **Ex. 21,** Valencia Interview Video." (Conventionally Submitted)\

46-48.    "Admit."

49.    "Admit that after already having kept Ms. Ward Stamp from her property for over a week, PPD officers sought and obtained warrants on March 2, 2022."

50.    "Admit. No PCSO Defendant intervened to stop this unconstitutional seizure of Ms. Ward Stamp's property."

51-52.    "Admit."

In response to Defendants' factual statement that Ward tackled Deputy McWhorter , supported by video and photographic evidence, as well as McWhorter's testimony that, "… he pulled my legs out from under me slamming me onto the ground …," Plaintiffs responded with *no* citations to record evidence disputing this fact, offering, instead, only unsupported arguments of counsel. Ward tackled Deputy McWhorter and placed himself in a threatening position on top of the Deputy. *See*

SUMF, at ¶ 14; RSUF, at ¶ 14; Reply in Support of Defendants' Statement of Undisputed Material Fact(s), at ¶ 14. The district court's findings to the contrary are blatantly contradicted by the record.

After Ward tackled Deputy McWhorter, "Ward continued to fight Deputy McWhorter, despite Deputy Gonzales' use of pain compliance techniques;" a fact Plaintiffs *admit*. *See* SUMF, at ¶ 18; RSUF, at ¶ 18. The district court failed to address, specifically, Ward's headbutt of Deputy McWhorter, but this fact is key to the qualified immunity analysis and is undisputed. Though Plaintiffs "deny" this fact, they offered no evidence contained in the record to support that denial. Instead, Plaintiffs' counsel argued that neither Deputy Gonzales, nor the Deputies' Body Worn Cameras observed or captured the headbutt. Deputy Gonzales was located behind Ward, who was at the time, on top of Deputy McWhorter, and was focused on applying pain compliance techniques. Her Body Worn Camera captured Ward tackle Deputy McWhorter, but from its vantage point, was unable to capture Ward's headbutt. Due to the level of Ward's resistance and aggression, Deputy McWhorter's Body Worn Camera fell lens down into the snow within seconds of the fight. Its inability to capture Ward's headbutt of Deputy McWhorter is not only obvious, but legally insignificant. Immediately following the altercation, Deputy McWhorter, with visible injury to his face and nose, told Deputy Gonzales that "he headbutted my

51

nose…" and seconds later feels for injury as he attempted to observe his injuries in the window of the Vehicle. Hospital records indicate he suffered serious bodily injury due to Ward's headbutt. There is no evidence contained in the record to dispute the fact that, during the altercation, Ward headbutted Deputy McWhorter.

Again, concerning Defendants' factual statement that, "[d]uring the fight, Ward grabbed onto Deputy McWhorter's duty belt, holster, and firearm," Plaintiffs assert that an alleged *lack of evidence* is sufficient to create a genuine dispute as to this material fact. Plaintiffs rely, solely, on their presented "fact" that "Defendant Gonzales vigorously denied that she ever saw Mr. Ward grab McWhorter's holster or firearm." During her interview, cited by Plaintiffs, Deputy Gonzales *actually* stated that Ward grabbed and pulled on Deputy McWhorter's duty belt, but she could not see exactly what piece of equipment he was "grabbing" due to their relative positions during the altercation. Deputy Gonzales corroborated this statement during her deposition when she was asked, "[w]hy did you think [McWhorter's] life was in danger?" She responded, "[b]ecause Ward was grabbing at his belt and not – and he would not let up." An independent witness, Ms. Stacy Hoff, also stated that she "couldn't really see" what, specifically, Ward was grabbing, but that Ward was "absolutely" trying to "grab things from the deputy," near "his belt or equipment" and, based upon her observations, believed Ward was grabbing Deputy McWhorter's

firearm. Immediately following the shooting, without time to concoct a story with his attorneys, as Plaintiffs' counsel unscrupulously alleges, Deputy McWhorter advised Deputy Gonzales that Ward "…tried grabbing my stuff," as he directed his eyes down to his firearm. Vitally, neither Plaintiff nor Tommy Brown, who both remained inside the Vehicle, witnessed the struggle between the Deputies and Ward. Plaintiffs have not presented, and cannot present, any evidence contained in the record disputing the Deputies' sworn testimony, or Ms. Hoff's statement, that Ward, *at the very least*, grabbed Deputy McWhorter's belt in the immediate vicinity of his holster and duty weapon; nor have they, or can they, present any evidence to dispute Deputy McWhorter's subjective belief that Ward was attempting to take his firearm.  *See* Henderson, 813 F.3d at 950-51 ("DO Thomas testified that he believed the door to the tub room was locked when he left. *Ms. Henderson presented no evidence to the contrary* … These undisputed record facts blatantly contradict the district court's factual determination that DO Thomas could have been subjectively aware of a substantial risk of bodily harm to Ms. Henderson"). Any alleged dispute as to whether Ward reached for Deputy McWhorter's gun, the violence with which he fought, or "… what Mr. Ward was or was not doing at the time he was shot," is entirely unsupported by the record and is "visible fiction."

Concerning the parties' respective statements of fact identified by paragraphs

46 – 52, above, regarding the alleged seizure of Plaintiff's property, it is undisputed that Plaintiff's personal property, including her cell phone and Vehicle, were seized by PPD, and not by PCSO personnel or Defendants. Plaintiffs, unequivocally, admit that "[t]he Application and Affidavit for Search Warrant(s) were executed by Detective Jose Medina of PPD, not by PCSO personnel;" that "PPD seized and possessed the Vehicle and cell phone *prior to* the issuance of the judicially authorized warrants;" and, that "PPD continued to possess the Vehicle and cell phone *after* the issuance of the judicially authorized warrants." Plaintiffs argue, instead, that "[t]he PCSO Defendants caused Ms. Ward Stamp's property to be seized by unlawfully arresting her…and *failing to intervene in PPD's seizure of property* that had no connection to any crime." *See* RSUF, at ¶ 53. Plaintiffs' arguments fail. It is undisputed that PPD, and not PCSO personnel or Defendants, seized Plaintiff's personal property and Vehicle; yet, the district court failed to grant summary judgment in Defendants' favor.

## VIII.  CONCLUSION

For those reasons stated above, and within Defendants' Motion for Summary Judgment and the Reply thereto, Appellants respectfully request that this Honorable Court reverse the Order of the District Court and dismiss Appellee's First, Fourth, and Sixth claims for relief in their entirety.

## IX.    STATEMENT REGARDING ORAL ARGUMENT

This matter, involving important and complex issues of qualified immunity, would materially benefit from oral argument and, therefore, Appellants contend that oral argument is necessary and will assist in the decisional process.

## X.     CERTIFICATE OF COMPLIANCE WITH FED.R.APP.P. 32(a)

Appellants' counsel certifies that this Opening Brief complies with FED.R.APP.P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED.R.APP.P. 32(f), this document contains 11,631 words.  This document further complies with the typeface requirements of FED.R.APP.P. 32(a)(5) and the type-style requirements of FED.R.APP.P. 32(a)(6) because this document has been transcribed using double-spaced, Times New Roman, 14 pt. font.

Further, this Opening Brief is an exact copy of the hard copy filed with the Court.  The electronic submission has been scanned for viruses and, according to the program, is free of viruses.

Respectfully submitted this August 22, 2025.

By:    s/    *Sean J. Lane*
Sean J. Lane, Esq.
Alex M. Pass, Esq.
**THE LANE LAW FIRM, P.C.**
3131 S. Vaughn Way, Suite 220
Aurora, Colorado 80014
Tel:  (720) 464-4215
Email:     slane@lanelawpc.com
            apass@lanelawpc.com

ATTORNEYS FOR APPELLANTS

## CERTIFICATE OF DIGITAL SUBMISSION & CERTIFICATE OF SERVICE

I hereby certify that on this August 22, 2025, a true and correct copy of the above and foregoing **APPELLANTS' OPENING BRIEF** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Darold Killmer, Esq.
Reid Allison, Esq.
Killmer Lane, LLP
1543 Champa St Suite 400
Denver CO 80202
Tel:  303-571-1000
Fax:  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
Email:  dkillmer@killmerlane.com
Email:  rallison@killmerlane.com


Mari Newman, Esq.
Andy McNulty, Esq.
Madeline Leibin, Esq.
Newman McNulty, LLC
1490 N Lafayette Street Suite 304
Denver, CO 80218
Tel: 720-850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com


s/ *Sarah Merrill*
Sarah Merrill